117-1654, Kevin O'Kane v. City of Chicago  Thank you, Your Honor. May it please the Court, Counsel, Christopher Jarko on behalf of the City of Chicago. Your Honor, this claim comes before you today on appeal for the Porter's Compensation Commission. We found that Mr. O'Kane sustained injuries of up to 25% loss of use of the man's hold pursuant to Section 82 of the Act. The Commission's decision was modified by the Circuit Court of Cook County, which awarded wage differential benefits under Section 81. We would submit that the Circuit Court erred by substituting its judgment for that of the Industrial Commission on the issue of permanency, which is a question of facts. The Commission's decision is not a dismanifest way of the evidence and should be reinstated. We have requested, Your Honor, that this Honorable Court revert the decision of the Circuit Court and reinstate the September 2016 Commission decision in its entirety. Your Honor, this claim involves a worker for the City who allegedly suffered a work accident on August 15, 2014. Why don't you just tell us why he shouldn't have been awarded a wage differential? That is the issue in the case, isn't it? Yes, Judge. The primary reason why a wage differential is not appropriate is because sufficient evidence exists in the record to support the Commission's decision that Mr. O'Kane deliberately limited his job search to low-paying jobs within very close proximity of his home. It's our position that any decision awarding a wage differential benefits for the remainder of this claimant's life would be speculative based on the evidence contained in the record. Is there an affirmative requirement that under Section 8D1 the claimant even conduct the job search? Your Honor, neither is case law in the way that there is an affirmative requirement. With that said, I do not believe the case law stands for the proposition that a claimant can simply present evidence which, frankly, is misleading to the court to create a presumption that he's perhaps more disabled than he actually is. In this claim, you have the evidence from two vocational experts who found that Mr. O'Kane refused to apply to a number of jobs, which they identified for him as earning rates higher than what he actually resulted in earning. There's evidence in the record showing that he fabricated job laws listing phone numbers that were either disconnected or wrong numbers. There's evidence to suggest that Mr. O'Kane reported that he spoke to certain individuals and employers that don't even exist or don't even work at those various facilities, and there's even evidence in the record where the claimant went to fill out job applications and within earshots of the receptionist or other employees of that facility made disparaging comments about the employer. So essentially, we have a case where the claimant is deliberately sabotaging his job prospects, where he's limiting himself to a low-paying job earning a mere $8.25 per hour, or those jobs identified for him which exceed that value. So what you're saying is he was unable to establish what he was able to earn in suitable employment? That's correct. Yes, Judge. Well, what about the broke rehabs suggestions? You know, didn't they establish in a sense what he was capable of earning? Yes, there were two through the method of rehabilitation. There were two labor market surveys. The first one indicated there were several employment opportunities where the claimant could have earned wages between $8.25 an hour up to $14.25 an hour, and that was conducted in November 2013. The mean wage for that job search was $10.58 per hour. Subsequent to that, about a year later, there was another labor market survey indicating that the mean wage actually increased to about $11.12 per hour. But even with that evidence in the record, even if the labor market survey identifies jobs earning a mere $8.25 an hour, that's not the claimant's earning capacity. In fact, to indicate that Mr. O'Kane's capacity is a mere $8.25 an hour would be speculative given the fact that he created a situation limiting himself to low-paying jobs. So what is his earning capacity? I'm sorry, Judge? What is his earning capacity based on the evidence in the record? I think it's unclear at this point because the claimant didn't put forth a good faith attempt to find substitute employment. Had the claimant actually put forth effort to show that he looked for a number of jobs and the best he could do was find an $8.25 an hour, I think, would be a stronger argument for the claimant. However, because there's such a significant amount of evidence that shows that he limited himself to these low-paying jobs within 10 miles of his home, I don't think the claimant can prove that he suffered impairment earnings. What would your reaction be if we reversed and remanded this matter back to the commission for a proper determination of his proper current wage? What would your reaction be to that? Well, Your Honor, I think certainly I would especially defer to your judgment. I don't think that this claimant should be entitled to a second chance in proving an impairment in earnings. Given the fact that he had two years of vocational rehabilitation, he clearly sabotaged the vote that was provided to him. He didn't apply to all the jobs he was supposed to. You're back down to job search. That isn't the issue, is it? I'm sorry, Judge? You're back down to job search, aren't you, talking about that? I mean, don't we have a simple case here that we have professionals who say that the mean average of a person in this situation would be $10, $11, whatever. There are two of them, correct? Yes, Judge. Commission looked at that. Commission looked at what job he chose to take at eight and a quarter. Correct. And they found that that was not suitable employment. That's correct. That's exactly it, Your Honor. That's your case? That is our case. Okay, so why is that not against the manifest way of the evidence? Well, it's not against the manifest way of the evidence because the claimant, the commission didn't believe the claimant. They didn't believe that the best he could do was eight and a quarter an hour. And, in fact, that's not his earning capacity because an earning capacity stands for the proposition that that's the most that someone's able to obtain through suitable employment. The fact that he elected to simply take the lowest-paying job he could possibly take, that's the best. So you're saying earning capacity is the most? What case do you have for that? I don't believe there's any case on point for that, Your Honor. But I think that would be a fair understanding of the phrase capacity. So it's our proposition that the eight and a quarter per hour isn't as fair as passing you the fact that there's a number of jobs out there that he could have but elected not to apply to. So where do we find that earning capacity is the optimal or the most that the claimant can make? Well, I think just assessing the definition, the layperson's definition of capacity would lead the court to understand that. Well, I'm sure you're able to earn minimum wage, you know, at McDonald's, aren't you? I hope so. I believe so, yes. No, is that the earning capacity? Certainly not, no. And, in fact, I don't believe that's the general public's earning capacity either. But we have no decisional law saying what earning capacity really is. Is that right? I did not find any directly on point, Your Honor. That's correct. Okay. But, Your Honor, from a policy standpoint, I think it would be inequitable to allow a claimant who deliberately sabotages his job prospects to create the impression that he's limited to an $8, $25 job. I think it would be inequitable to award him such a significant weekly benefit for the remainder of his life. In fact, my brief, Your Honor, I allude to a number of provisions in the Act which require that both parties prosecute the claims in good faith, including Section 8A maintenance benefits requires prosecution of a claim in good faith, even though it's not expressly stated under Section 8A. So good faith means that the claimant goes out in the labor market in an effort to maximize his earnings. I believe good faith would require the claimant to put forth an honest attempt to return to suitable employment in the labor force. Okay. Yes, Your Honor. And, frankly, again, to be honest, there's so many provisions in the Act which require that. So suitable employment is the maximum that the person could earn in the labor market. No, Your Honor. Yes, Judge. Because this is only an economic statute, after all. Correct. Yes. So your position is he didn't sustain his burden of proving the wage differential. He didn't prove that his post-accident capacity to earn is less than his pre-accident capacity. So notwithstanding the fact there is evidence provided by the voc rehab experts, he didn't carry his burden. Is that your position? Reduce to a simple answer. That's essentially the crux of our argument, Your Honor. Yes. How is the burden not met? It certainly wasn't met, in my opinion, at 8.25 an hour. Yes. But how can you say he did not meet his burden of establishing that he was entitled to a wage differential because of the evidence that was introduced? By the vocational rehabilitation experts. They said the maximum he could earn was $14 an hour, some number, and they gave the median numbers. So why shouldn't we find that although he didn't meet his burden at 8.25 an hour, that that was the maximum he could earn? There certainly is evidence in the record that the maximum that he could earn would be what the vocational rehabilitation experts said. Yes, Your Honor. But the fact that he was so deliberate in sabotaging job prospects creates an issue of credibility for the plaintiff, which the commission – Credibility for what? I mean, your argument, your entire argument is aimed at 8.25 an hour that the wage differential that the circuit court judge gave him was calculated based on it. So assume we agree with you that he sabotaged any effort. 8.25 is not the maximum earning capacity that he has. He shouldn't have received the wage differential calculated on that number. But why shouldn't we recalculate or send it back to be recalculated based upon the maximum earning capacity that the vocational rehabilitation experts said he could earn in? Well, because the circuit – the commission is the finer of fact, and they found that the claimant didn't meet his burden of proof. He – so the claimant can be established with earning capacity. Is there any evidence in the record that this man could earn the same amount of money that he was earning before he was injured? I don't believe so, no, Judge. Well, then he's established a diminution in earning capacity, which is the element that he's required to establish. He just didn't establish it at 8.25 an hour, 8.50, whatever he's getting paid. Well, I think the claimant needs to establish the entire – both elements of the claim at the same time. Well, but the evidence – the evidence of record establishes a cap of what he could earn. It doesn't make any difference who introduced it. But, Your Honor, I think the fact that because he created an appearance that he was more disabled than he actually was. Yeah, so if we buy that argument, he doesn't get a wage differential calculated on, what is it, 8.25 an hour? Correct, yes. 8.25 an hour. But that's not to say that he's not entitled to any wage differential. Well, I think, Your Honor, that also leads into my good faith argument that both parties are required to prosecute the claims in good faith. And this is where the claimant deliberately sabotages job efforts, deliberately falsifies job logs, indicating that he's speaking to people that don't even work for the employers, putting forth incorrect phone numbers. I don't think – from a policy standpoint, I don't think a claimant should be rewarded with a lifetime of wage differential benefits, regardless of what's – The argument has some intuitive appeal, but do you have any cases that say that? I mean, if the evidence is in the record supporting that obviously there was a diminution in earnings, his ability to earn what he can now versus the past, You're saying the fact that he didn't operate in good faith trumps everything else and we should ignore altogether evidence? I think that would be a fair assessment, yes, Judge. But where's that coming from? What case law do you have that you can point us to? Your Honor, there's no case law directly on point, but I think if you take a look at the act as a whole, the primary purpose of the act is to provide financial protection for claimants who suffer work injuries. And if you look at the number of provisions which require claimants to work in good faith through the prosecution of their claim, if you look at Archer Daniels' case, as far as maintenance is concerned, Archer Daniels states that maintenance requires that claimants either provide job search or vocational rehabilitation and pursue that in good faith. But good faith is nowhere outlined in Section 8A, similar with Section 8B TTE benefits. Interstate scaffolding indicates that there needs to be good faith prosecution of their medical care in order to be entitled to 8B TTE benefits. That's not enumerated in the act. So in other words, you could say why should the claimant be rewarded for conducting himself in this manner? Yes, Judge. What's the sanction against doing that from a policy standpoint? But as my learned colleagues have pointed out, the punishment is, the sanction is, he doesn't get what he wants. He wanted the 825 to be the figure. Obviously, we're not talking about that figure. But if you're experts, if your evidence comes in at a higher figure, why couldn't we look to that? Well, I certainly think you could, Your Honor. But I think it would be unfair. I think it would be unfair and inequitable to employers. That we shouldn't fill in the gaps, or the Commission shouldn't fill in the gaps. That's correct. Okay. Yes. So I will let Your Honor submit these other questions and leave it. You'll have five minutes to reply. Thank you, Your Honor. Counsel may respond. Good morning, Your Honors, and may it please the Court. My name is Carpal Salvato, and I represent Mr. O'Kane, the Petitioner and Advocate in this case. I've sat back and listened to counsel say that Mr. O'Kane has deliberately and intentionally sabotaged the vocational rehabilitation efforts that were put in place by the Respondent. Well, the real issue is whether – let's get to the issue. Okay, let's not go histrionic on this. Did he establish his earning capacity? I believe that he did, Your Honor. There were two companies that were under Respondent. For suitable employment. It's the two companies. GenX and MedVolk. GenX was put on the case for one year. They were terminated. They couldn't find a job. MedVolk came in, did the exact same thing. They were on the case for basically a year. And a 64-year-old man with permanent disabilities, high school educated, went out and found his own job. Wasn't that MedVolk and GenX's job to go ahead and find him a job? He went ahead and found his own job. Well, let's establish something different. They presented him with contacts, did they not? Yes. So he has always the job. It's his obligation to go out and seek it. Nobody sits there and calls you nothing. Not only did he follow through with all of the job leads that they sent him to, he went, as he's required to do, to try to mitigate his damages and try to find a job on his own. Eventually, two years later, a 64-year-old man with high school education and permanent restrictions found his own job. If you look at the monthly reports from GenX and MedVolk, which are contained in the record, there's 24 monthly reports. There's one mentioned. One. One time, Mr. O'Kane said he was on loan to go to a job interview somewhere in an area that he did not feel safe because he did not drive with good public transportation. One in 24 months. Your honors all know, gave this to my national team, that if he was not acting in good faith, they could have stopped his CTD numbers, stopped his maintenance. They did nothing. Where is this coming from that he didn't operate in good faith from working hours, walking and doing good things? Well, that's what the arbitrator found, right? I have no idea where she found this. You want to talk about sabotage? Sabotage is what the arbitrator did to Mr. O'Kane's life. That's what she did to his life. Think about this man who was being paid voluntarily by the city. Being paid voluntarily after he found his own job and couldn't find a job. They started paying temporary partial disability benefits of $717 a week. We walked into a hearing to basically stipulate to the wage differential and the arbitrator goes off into left field and says that he's been uncooperative based upon one vocational rehabilitation report of 24 months. It says that he sabotaged. Can I ask you a question? Yes. Did MedVac identify 21 prospective employers and did your client testify that he didn't apply to any of the identified jobs? I do not think so. That's not true? That record doesn't show that? That is not true. As I said to the panel, there were 24 months worth of jobs, vocational rehabilitation reports. I remember one instance where Mr. O'Kane was- Well, you remember, but the record- The record doesn't say that you remember that. No. So you're disputing that they just picked that out of thin air. They undoubtedly, without question, picked that out of thin air. Had he been sabotaging his efforts, not going to job leads, not submitting his job logs, why did they continue to pay him for 24 months? After he found the job at 8.25, he picked up the phone and said, are you okay with this job at 8.25? Yes, counsel, at least he's back to work. We'll start paying him 7.17 and up a week instead of- Let me ask you another way. Was your client ever asked why he did not follow up with the contacts and the leads that he just alluded to? Was your client ever asked about that during the hearing? I don't believe that he was ever asked about it, and I don't believe that it's our position that he did not- that he did not cooperate in any way, shape, or form. As I've stated, had they believed that he wasn't being cooperative, they would have stopped his benefits. They voluntarily started paying him every partial disability based upon the job he found on his own. Okay, what about the argument- What about your opponent's argument that he didn't really establish anything? Evidence was not introduced by him. He was stuck in the figure of 8.25. He represented that's the best he could do, correct? He represented it's a job he found on his own. They could not find him a job. For two years, they hired two companies. GenX was supposed to be an expert, as Justice Holdridge noted. Then they terminated GenX and they brought Medvoc in. Two years working with a 64-year-old man that couldn't find him a job, he went out and found his own job. After he found his own job, they agreed to that position. Do you know what Cohen's written report states as it relates to your client following up on referrals she gave him? Do you know what her report says? I don't recall it. If she was one of the original vocational counselors- She was from GenX. There was absolutely no issues with respect to GenX. According to the record, her report says that he failed to follow up on multiple referrals, failed to submit applications to resumes when requested by prospective employers, and provided inadequate or invalid contact information. That's what her report says. Why would it say that? If that were in fact the case, why did the city respond to continue to pay him for 20 more months? That's not answering the question. Why would she say that if that wasn't true? I don't have the answer as to why she would say that or do it. Well, that's in the record. Let's assume for our sake of argument that's in the record, okay? And your argument is that TPD was being paid with eight and a quarter as the base, right? Correct. Okay. But we're not here on a TPD case, are we? No, we're not here on a TPD case. What I'm trying to establish to you is that he was so cooperative with the city and they were so in agreement that when he filed a job at eight and a quarter, how would they agree to start volunteering to pay him again all the way until the day approves? Now, are they bound by that? I don't know that they're bound by that, but it does establish a course of conduct on behalf of the respondent that they basically aggressed at an eight and a quarter job. Had they had a problem with it, why did they continue on with vocational rehabilitation? In fact, they closed their file, they started paying him temporary partial disability, and we walked into a hearing where we were supposed to basically just stipulate to approve him as to the wage differential amount, and the arbitrator went off in the left field and found one report out of 24 months where she found a reason in that given the wage differential and said he's an 18-2 candidate and not have specific rights. Well, that was clearly an erroneous matter of law direction that the arbitrator went. But you have this TPD, closed the file, and now you're looking for wage differential. Correct. Basically permanent wage differential. Okay. And so the evidence is presented that right now he's earning eight and a quarter. Employer presents evidence that there's a mean with both of those voc experts, which is higher than eight and a quarter. Correct. There was one voc expert that came in and testified that they were able to find a job that was higher than eight and a quarter. They submitted labor market surveys with a range. A range that is quite honestly not realistic for a 64-year-old man with a high school education and permanent insurance. You've got to be a little bit careful about that. So are you telling us, are you all in on the 825 figure? I'm not in on the 825 number figure, but that's what was established. By him? By him. And it was accepted by the circuit court as his earning capacity. Yeah, we're reviewing the commission. They're the supposed experts in all of this in the scheme of things. Okay. I'm in the circuit court. We have a factual dispute going on here because he's pointing and he just found a report that says he was given leads. You're saying he did everything he was supposed to do. So there's somehow a very big difference in the record over what he did and didn't do. Counselor, just for your information, the arbitrator identified the labor market survey dated November the 4th, 2013, as the report where MedVoc identified 21 prospective employers. If that helps you. Thank you, General. I'll go back and look at it. But as I stated, had they thought that he was not acting in good faith, was attempting to sabotage the efforts of the vocational counselors, there is a remedy in the national team. Stop his benefits. My suggestion to you is that that was not the case because if that were the case, they received these monthly reports, just like I did, over the 24-month span. They would have stopped his benefits. They did not only stop his benefits. They agreed to the $8.25 that he filed, and he campaigned on TV dating. I don't understand why the arbitrator came up with this. Well, it occurs to me that it may have been an error not to award him a wage differential. But then again, he didn't prove that $8.25 an hour was all that he could earn. So maybe the proper resolution in this case is to affirm that portion of the circuit court's order that awarded him a wage differential, vacate the wage differential that was given to him, and send it back to the commission and tell them to compute it. That would be certainly a more fair resolution than what the arbitrator came up with. Well, the arbitrator didn't want to give him any wage differential at all. For whatever reason, I could not tell you. The man couldn't be more compliant over a 24-month period of time. When I would file his own job, he came in and testified on the world truthfully. There was nothing in the record that said he was being dishonest or had secondary gain issues or anything along those lines. We walked into a hearing again to prove up a wage differential, and the arbitrator went somewhere out in the left field and said that he didn't need to be established there based upon his likelihood of the other, which is not the second problem. We're reviewing the commission. Did the commission find a wage differential? No, they did not. Okay. So the commission never found a wage differential. It increased his specific loss. Yeah. His PPD, an AC-2 award. Yes. Right. Any further questions? I don't believe there are. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honor. Nothing to belabor the point I think you understand. So if this were sent back to the commission to find out what his earning capacity was, we're really reversing the commission. Is that right? I believe so, yes. Because the commission never made a finding of a wage differential under the first problem. Is that correct? Correct, Your Honor. Okay. However, as I was sitting at counsel's table, I was thinking a little bit more about the labor market surveys that you were discussing. And to address that, it's the commission's job to weigh the evidence, determine what's reasonable, what is the most credible. They have the same record that we have today. They have these two labor market surveys. They didn't find that that evidence was pertinent to the claim to award a wage differential. I believe the commission is free to reliance whatever evidence it feels necessary to reach its determination. Does it find those labor market surveys to be credible? I don't think they have to give that much weight. Wait, wait, wait, wait, wait. What do you mean they didn't find it to be credible? Well, the commission looked at the labor market surveys, and they found that they didn't need to consider that evidence. Well, the commission got hung up or sort of the arbitrator on the fact that this guy wasn't putting maximum effort. But that doesn't mean he's not entitled to a wage differential. It just means he's not entitled to a wage differential calculated at $8.25 an hour. So there was nothing in this record to suggest the commission didn't find the labor market studies to be credible. Heck, they were your labor market studies. You're not contending your own evidence was incredible, are you? I think it would be. No, I'm not. Okay. However, the commission can rely on what evidence it deems necessary. Well, it can't ignore evidence either. You know, I mean, the question is, it's manifest weight. And if there's labor market studies that you put in showing that this man is capable of earning this range with a maximum of X and a median of Y, then how can you suggest that he hasn't, and if that's less than he was earning, how can you make the argument or how can the commission make the argument he hasn't established his right to a wage differential? I think just very simply, Your Honor, based on the fact that any wage differential calculation would be speculative given the fact that the claimant, he did not put forth a good faith argument. There's all sorts of evidence in the record to suggest that he blew off job prospects. Okay. Let's set the case. Is there sufficient evidence to show from your evidence that there was an impairment of earnings? Yes or no? You're not disputing that, are you? No. No, Your Honor. There is sufficient evidence to establish that, yes. Okay. So there's a failure of proof as to what those earnings would have been with capacity and suitable employment. Yes, Judge. Okay. So you're saying that it's perfectly appropriate, therefore, for the commission to award a PPD AD2 award, right? I believe it would be appropriate, yes, to award an AD2 award given the fact that there needs to be good faith prosecution of the claim. So now you're just talking about the claim itself. You're not talking about the activity. You're saying that there was a failure of proof on the second wrong. Yes, Judge. So unless there's any further questions in conclusion. Well, I do have a further question. Yes, Judge. Okay. On your voc situation, your experts here, we've got a range and then an average. Is that right? Correct. And what is the average? How is it calculated? There are two separate labor market surveys conducted. The first average came out to $10.15. What do you mean by average? I believe the counselor took the totality of the job prospects that were provided, determined the wages that they would offer, and then did a mathematical calculation to come to the mean. It's the mean. It's the mean. Yeah. Okay. So you have three measures of central tendency in statistics, mode, mean. Correct. And median. So which is it? And which is appropriate? I thought mean was the average. No, mean is an arithmetic measure of central tendency. Okay. Well, I believe the law, the statute, says mean. Okay. I think so. Okay. So $10.58 is the mean? Is that what you're representing? Well, actually, the most recent labor market survey, the mean is $11.12 per hour. It's actually higher. So we would just ask if you reverse the survey course decision to restate that commission as it's consistent with the manifest committee evidence. Thank you, Counsel. Thank you, Counsel, both for your arguments. In this matter this morning, it will be taken under advisement and a written disposition shall issue.